UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 15-197 |
| v. | * | SECTION: "H" |
| BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC | * | |
| * | * | * |

FACTUAL BASIS

The United States, represented by the United States Attorney's Office for the Eastern District of Louisiana and the Environmental Crimes Section of the Department of Justice, and the defendant, **BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC ("BEE")**, hereby agree that this Factual Basis is a true and accurate statement of the Defendant's criminal conduct, that it provides a sufficient basis for the Defendant's plea of guilty to the charges contained in the Second Superseding Indictment in the above-captioned matter, and had this matter proceeded to trial, the following facts would be established beyond a reasonable doubt through competent evidence and testimony:

From July 1, 2010, until October 13, 2013, **BEE**, a privately held limited liability company, owned and operated an oil production facility erected on a federal mineral lease, OCS-00367, in the Gulf of Mexico, approximately eight nautical miles from the shoreline of Louisiana, at an area designated as West Delta 32, in the territorial jurisdiction of the Eastern District of Louisiana.

**BEE**'s production facility at West Delta 32 consisted of three bridged platforms, "A," "D," and "E." The facility was operated by a crew employed by WOOD GROUP PSN, INC. ("WOOD GROUP PSN") consisting of a Lead operator, also known as a Person-In-Charge

("PIC"), two "A" operators, a "C" operator, and a Roustabout. The PIC was responsible for the oversight and safety of the production facility.

On or about September 1, 2012, oil production at West Delta 32 was shut-in, meaning that the oil was not flowing through the wells at the facility, due to damage in the pipelines that transported BEE's oil. From on or about September 1, 2012, until on or about November 16, 2012, the facility at West Delta 32 underwent repairs. BEE initiated construction projects that included replacing the floatcell (also known as the WEMCO), upgrades to the free water knockout separator area, replacing valves on the manifold of the production header, and installing a divert valve on the Lease Automatic Custody Transfer ("LACT") unit and tying it into the sump line piping.

The LACT system was the last point in the production process prior to the oil leaving West Delta 32 and entering the sales transmission pipeline. The LACT system consisted of two pumps that took suction from one of two 400 barrel Dry Oil Tanks on the "E" platform. The pumps discharged through the basic sediment and water ("BS&W") monitor and then through the oil pipeline pumps to the sales pipeline. BEE planned to have the system modified to include a divert valve. The divert valve would redirect flow to the Wet Oil Tank when the BS&W monitor indicated unacceptable contaminants in the crude oil, keeping it out of the pipeline for sale until it was processed to an acceptable quality.

In October 2012, BEE contracted with an engineering firm to design plans for the floatcell replacement. BEE hired defendant DON MOSS ("MOSS") to be physically present at the West Delta 32 facility to inspect and coordinate the construction project and monitor worker safety.

The construction projects DON MOSS was to coordinate and inspect were to be physically completed by crews from defendant GRAND ISLE SHIPYARD, INC. ("GIS"). Beginning at a time unknown, but prior to November 3, 2012, **BEE** contracted with GIS and requested a multiple man construction crew. GIS and **BEE** had forged a Business Alliance Agreement prior to this time wherein GIS was a preferred contractor for **BEE**. GIS employed defendant CURTIS DANTIN ("DANTIN"), a construction superintendent, to be physically present on West Delta 32 managing the construction project and workers. GIS staffed the job with its own employees and employees from a third-party sub-contractor. The employees of GIS's subcontractor were all from the Philippines. WOOD GROUP PSN's operators supported the construction efforts to include conducting crane operations and issuing necessary hot work permits.

The construction projects on West Delta 32 required hot work to be done. Hot work is welding, grinding, and/or any other activity that may produce a spark. Hot work on an oil production facility is a hazardous activity capable of causing injury or death if done without due care and adherence to safety procedures and regulations.

In November of 2012, **BEE**'s company policies mirrored Title 30 of the Code of Federal Regulations Section 250.113(c)(1)(i) and required that written permission, commonly referred to as a "hot work permit," be issued by the welding supervisor or designated PIC before any hot work on a production platform began. Those involved in welding and the PIC were required to (1) conduct a pre-work inspection of the areas where welding or associated hot work was to be performed, (2) ensure that the area below and around the area where the work was to be performed was free from fire and explosion hazards with any equipment

containing hydrocarbons or other flammable substances moved from within 35 feet of welding areas, and (3) ensure that a firewatch with gas detection equipment had been assigned. If equipment containing flammable substances could not be moved, it had to be flame proofed or the contents rendered inert.

A hot work permit was not valid indefinitely. At a maximum, a hot work permit was valid for 12 hours. Once a hot work permit expired, all the precautionary steps, including a pre-work inspection, should have been completed again before a new hot work permit was issued. Welding on piping that had contained hydrocarbons was prohibited unless the piping was first rendered inert and the PIC determined that it was safe to weld.

Starting on or about November 8, 2012, defendant CHRISTOPHER SRUBAR ("SRUBAR"), a WOOD GROUP PSN employee, was the PIC for West Delta 32. BEE authorized SRUBAR and other WOOD GROUP PSN PICs to permit hot work on their facilities. On November 8 and 9, 2012, SRUBAR issued hot work permits for the construction work related to the WEMCO, separator, and/or production header on West Delta 32. Starting on or about November 10, 2012, SRUBAR stopped issuing hot work permits and conducting all-hands safety meetings. Instead he delegated the hot work permitting to the WOOD GROUP PSN "C" operator, who had approximately 7 months' total offshore experience. At SRUBAR's direction, the "C" operator created each hot work permit by copying the one SRUBAR did on November 9, 2012, that only authorized hot work related to the WEMCO, separator and production header. SRUBAR did not conduct a pre-work inspection with the construction crew every day that hot work was performed, nor did he designate a firewatch for the hot work areas. Similarly, the "C" operator was not instructed to nor did he perform a pre-work inspection with the GIS crew before providing each new hot work permit related to the

WEMCO, separator and production header. SRUBAR instructed the "C" operator to let

DANTIN designate a firewatch each day, but that was not done prior to the hot work permit

being issued. After November 10, 2012, the hot work permits were given to DANTIN each

day by the "C" operator. There were no gas detector readings performed in the hot work areas

for the WEMCO, separator and production header by any WOOD GROUP PSN employees

prior to the issuance of the hot work permits, and there was only one hot work permit issued

each day despite the fact that the areas in which GIS crews were authorized to conduct hot work

were on separate decks of the "E" platform. Those work areas could not be properly watched

and continuously monitored for gas by a single firewatch with one gas detector. The "C"

operator understood that hot work was continuing in the WEMCO, separator, and production

header areas, and did not ask the GIS crew if they would be performing hot work in other areas.

DANTIN did not communicate with SRUBAR and did not ask for hot work permits for specific

locations.

MOSS was aware that BEE hoped to resume production on the platform soon after

November 16, 2012. BEE would save money if the LACT upgrade could be completely

finished before production resumed and the upgrade would not have to performed at a later

date when the wells were flowing oil. On or about November 11, 2012, MOSS informed BEE

on-shore representatives that the piping and divert valve necessary for the LACT upgrade were

lost and that he would not be able to finish the project on schedule unless the piping was

rebuilt immediately. Months earlier, BEE had attempted to perform the LACT upgrade, but

had to postpone the work. At that time, BEE decided to eliminate field welding needed for the

project by sending the piping to GIS to have all the welding done onshore and to build

additional spool pieces so that the piping needed to connect the LACT divert valve to the sump

line piping could be bolted in place. On November 12, 2012, when it was determined that all the pre-fabricated piping for the upgrade was lost, in order to save time, **BEE** decided to have all the piping re-built except for the additional spool pieces. Without the additional spool pieces, the construction crews were required to complete field welds on the LACT piping in order to connect the divert valve to the sump line piping. The **BEE** employee who made the decision to weld the sump line piping instead of bolting the piping into place, did not effectively communicate the plan to weld the sump line piping to SRUBAR or to the **BEE** operations' supervisors who communicated with SRUBAR on a daily basis. **BEE**'s operations supervisors and SRUBAR were told in an email that the LACT project would be complete by Friday, November 16, 2012.

Despite the facility being shut-in, this work required the sump line piping to be isolated from the Wet Oil Tank and any contents of the piping rendered inert before welding occurred. MOSS and DANTIN knew that the welding of the sump line piping would be required to complete the LACT unit upgrade. Prior to the construction crew performing any hot work on the piping, MOSS and DANTIN were required to get authorization and verification from SRUBAR that the piping was safe. This would require a pre-work inspection with SRUBAR and the welders, the designation of a firewatch with a gas detector, and a hot work permit specifically authorizing hot work for the LACT unit or sump line piping.

MOSS and DANTIN, however, never coordinated or communicated with SRUBAR about the project after the piping was re-built onshore by GIS. On the evening of November 15, 2012, MOSS and DANTIN knew that GIS crews began installing the divert valve for the LACT unit upgrade. This did not require hot work, but MOSS and DANTIN knew that the crews were going to work in the area again the next day, November 16, 2012, which was the

projected last day of construction.  MOSS and DANTIN knew that welding would be required to tie-in the sump line piping to the divert valve piping. However, neither MOSS nor DANTIN asked SRUBAR to make the sump line safe on the morning of November 16, 2012.

After leading a 6:00 a.m. safety meeting with the GIS workers on November 16, 2012, DANTIN instructed some of the Filipino construction workers to begin the welding of the sump line piping for the LACT unit upgrade, while others finished projects on the cellar deck and at the floatcell. MOSS only briefly attended the safety meeting and SRUBAR did not attend at all. Neither MOSS nor DANTIN warned the GIS crews in their morning safety meeting to not weld on the sump line piping until SRUBAR or crews from WOOD GROUP PSN deemed it safe. Rather, MOSS encouraged the GIS crews to finish the remaining jobs so that he could return to shore.

Despite SRUBAR having received the Daily Construction Report by email before 7:00 a.m. on November 16 indicating work had been performed on the LACT unit the night before, SRUBAR did not inquire about the job or walk the platform to make sure he knew what was happening. The "C" operator was present in the galley eating breakfast at the same time GIS was there conducting its 6:00 a.m. safety meeting, but he did not understand that hot work was intended for areas outside of the WEMCO, separator, and production header and did not ask GIS where they would be working on November 16, 2012, prior to issuing the hot work permit that day. The single hot work permit the "C" operator issued for November 16 did not mention the LACT unit or sump line piping as areas that were safe for hot work. The GIS crew wrote a WP/SEA, otherwise known as a Job Safety Analysis worksheet, that all the crew signed, but neither MOSS, DANTIN, nor SRUBAR read prior to the GIS crew beginning their work.

Once the GIS LACT unit crew began working, DANTIN watched as the workers made cuts to the sump line piping leading to the Wet Oil Tank. The Wet Oil Tank was approximately 20 feet from the welding area on the sump line piping. The Wet Oil Tank could not be physically moved 35 feet from the welding area and the hydrocarbons in the Wet Oil Tank had not been rendered inert prior to the workers beginning the project. After the cuts to the sump line piping were made, liquid spilled from the piping. DANTIN and the workers decided without input from SRUBAR or the WOOD GROUP PSN crew that the liquid was water and that the piping was safe to weld. DANTIN left the area and returned to the office located on another platform within the West Delta 32 facility where MOSS and SRUBAR had offices. Despite having not cut or welded in the LACT area during the previous days of the construction project and not knowing if the contents of the Wet Oil Tank or the sump line piping had been rendered inert, DANTIN did not ask SRUBAR or MOSS whether the welding on the piping posed a threat before he allowed the construction workers to continue. MOSS and SRUBAR both knew that the sump line piping which previously contained hydrocarbons had not been rendered inert and was not safe for welding.

Following the cuts to the sump line piping, the construction workers commenced grinding on the piping. At approximately 9:00 a.m. on November 16, 2012, the construction workers attempted to tack weld on the cut piping with an arc welder. At that time, hydrocarbon vapors that had escaped from the Wet Oil Tank were ignited. The ignition caused an explosion setting off a series of additional explosions in the three oil tanks on the platform. One of the Dry Oil Tanks and the Wet Oil Tank were blown into the Gulf of Mexico. The other Dry Oil Tank was blown off its base and destroyed the platform crane. Oil spilled into the Gulf of Mexico causing a sheen on the water. Oil rained down to the lower deck of

the platform where workers below the LACT unit had been performing other construction activity. The fire and explosions that occurred resulted in the deaths of GIS construction workers Avelino Tajonera, Elroy Corporal, and Jerome Malagapo. Other workers were seriously burned and physically injured.

Prior to the crews going to work on the morning of November 16, 2012, MOSS, SRUBAR, and DANTIN failed in their obligation to properly communicate about the specifics of the work to be done for LACT unit upgrade. They failed to properly communicate despite the fact that each of them lived and worked on West Delta 32 from November 8, 2012, until November 16, 2012, and that each of them knew days before November 16, 2012, that the LACT unit upgrade was part of the construction work to be done on the platform. The last day that MOSS, SRUBAR, or DANTIN followed proper procedures for inspection and permitting for hot work was November 9, 2012.

The government's evidence would prove that **BEE**'s employees and agents were negligent in the manner in which they planned and executed the hot work on the West Delta 32 platform, and that the acts of their agents and employees violated the regulations in 30 C.F.R. § 250.113 promulgated under the Outer Continental Shelf Lands Act. As result of its agents' and employees' negligence, oil entered the Gulf of Mexico in a quantity sufficient to

cause a sheen. **BEE**'s costs associated with accident investigation, repairs, clean up, and search

and rescue was approximately $9,707,749.00 USD.

READ AND APPROVED:

_____
BLACK ELK ENERGY OFFSHORE
OPERATIONS, LLC
By Richard Schmidt, Trustee for the
Black Elk Liquidating Trust and
Black Elk Litigating Trust Pursuant to
Chapter 11 Bankruptcy Plan for Reorganization

3/29/17
Date

_____
Matt Chester
Attorney for Defendant

3/29/17
Date

_____
Emily K. Greenfield La. Bar. 28587
Assistant United States Attorney

5/12/17
Date

_____
Kenneth Nelson
Senior Trial Attorney, ECS

5/12/17
Date

10